Good morning, Your Honors. May it please the Court, my name is Dow Patton. I represent Stephen Ingram in this matter. I'd like to reserve five minutes for rebuttal into the Court of Appeal. This case, Your Honors, is an interesting case because it provides the Court an opportunity to give instruction to the District Courts on how to handle disciplinary judgment matters when we have a discrimination in a discipline case, and the employee's record is less than perfect. Here, the District Court committed a serious error at the outset of its analysis by applying the substantial evidence standard during the first position. Let's just assume, perhaps, that the District Court did apply the correct standard, but applying the lesser standard, you know, to raise the inference, it's less than a preponderance. Tell me how you have met that standard, Your Honors, because as you would like to hear, I'll give you an opportunity to persuade me that he was performing satisfactorily. Thank you, Your Honor. Yes, I'm happy to address that. There's just some primary points of evidence that demonstrate that Stephen Ingram was qualified for the position at the time of the discipline. First, that he had taken his switching tests. He had received a 92% in previous. He had a perfect score. Just the months before, he switched the incident that led to his termination. That's an expert's record, 148. But he wasn't, he wasn't being hired here, he wasn't potentially being promoted. He was terminated, so we're looking at this, I believe, according to our cases, from the percentage, but was he performing satisfactorily? And so, you know, unfortunately, you have to deal with a couple of very significant aspects of your client's record, and that is that his, and he was, for his position here for PG&E, he needed to drive, and his driver's license was suspended. He continued to drive, even though his drive, even by his PG&E people, supervisors, if his license was suspended, or once they found out his license was suspended. He had a DUI after his license was suspended, and he also, you know, did not follow direct orders when he was doing this important exercise with respect to the electricity that caused a severe outage and caused him to be, to be injured himself. So, tell me why, in light of those pretty significant, I don't see many records quite, quite so significant in terms of being written up, why he was performing satisfactorily. Yes, you know, it's come at the point of, was he performing immediately prior to the events that resulted in his termination? Was he performing at that time meeting his employer's expectations? And the evidence is, number one, that he was. He was the, when the submission hearing occurred, his supervisor, Mr. Yankin, testified that, yes, I assigned him because Mr. Ingram was qualified him to do so. He stated that, in his own deposition, is that, or his supervisor. Now, that's with respect to the, that he's involved in some submission hearings. With respect to. Was it another reason that he was assigned to help this individual? Is that the individual had a driver's license, and since your client didn't have a driver's license, and was ordered not to drive, that this exercise thing was viewed as a means to allow your client to do his job that day? Yes, sir. There is evidence of that in the record, and further, that shows that Mr. Ingram was following his supervisor's instructions at the time, and was, and was doing that, at the, immediately before the time with the events that are at issue in the case, which are the key part of the case. Had he been assigned to train anybody before that? I don't believe that he had been, I thought he was assigned to anyone. And I was just wondering if he really was asked to, to train. I have the same sort of question as Judge Cariello in terms of whether or not he needed the training of the other person, because that other person had a driver's license. The, the, the substation where they were performing work, there's evidence in the record that we signed in our opening brief, that demonstrates that driving is not required to perform a substation maintenance nutritionist duties. Driving is simply not required. It's required for going out into the field, etc. But when they're assigned the substation, which is where Mr. Ingram was assigned at the time of the events that led to the termination, there's no requirement, and there is no evidence in the record otherwise, that there was a requirement that he drive at that time. The further evidence before the district court was that he was, he was following his orders after he was told not to drive. When he was told not to drive, he followed those orders. That's, that's undisputed evidence that's in the record. So what we have here, Your Honors, is, is immediately before the offense that resulted in the termination, he's following, he's following orders. He's, he's qualified to do so. He's passed his, his examinations. And the, the other factor here is, is very important for Your Honors to, to take note of, which is the existence of the Selective Marketing Agreement and Progressive Discipline Policy, otherwise known as Positive Discipline. The employer under that agreement with the union, the employer cannot look back past six months to determine discipline for creating the next level of discipline. And that, and by considering those things, the, the district court committed error, because you can create a laundry list of everything that ever occurred, but if the employer under the Collective Marketing Agreement is prohibited from using those prior errors, that prior history to, to, to discipline, then that's, that's outside of the context that the, that the employee finds themselves in. Who, what other employee or employees can you point to who are similarly situated to you? That was your client. Thank you, Your Honor. But Chris Hackworth. That was at UR 52 and 61 through 67. He's a Caucasian who was accommodated. Well, he had no license. He was picked up from work and taken home. But to distinguish you back there, Mr. Hackworth told his employer that he didn't have a license. So they could accommodate him here. Your client did not reveal that his license, which was core to his job, had been suspended. He had a DUI after that. In fact, he perpetuated this misrepresentation onto the, to his supervisor, saying he, oh, he wasn't sure if he had a license or not, when he knew full well he didn't have a license. That, Your Honor, that is the exact error that the district court makes, Your Honor. Knowing full well that he did not have a license. Well, I said full well, but he knew that he had problems with his license and that he didn't know about the status of his license and that it had been taken at one point in time from the police authorities. And he got to the DMV a couple times to try to get a license, and he was not able to do that. He still, even though when he showed up for a driver's test, did not reveal everything that he should have revealed to his supervisor. Yes, he's right. And it's true that, isn't it, that on May 20, 2010, your client received a ticket for an expired driver's license? I believe so, yes. And so at that moment, he would have known that he had an expired driver's license, correct? I don't know what he saw at that time. What he testified to was that the police officer explained something to him and that he did not understand the documents that were given to him. Isn't that related to his DUI? There's no explanation given as to this expired driver's license incident. I don't recall the testimony, Your Honor. So here you have it, at least as of May 20, 2010, he receives a ticket for an expired driver's license, and he'd be on notice. And at that moment, he had a duty to report that to his employers, correct? I don't believe that there's a duty to report it. Isn't that what was provided in the form that was signed, indicating that he would comply with all DOD requirements and he would explain any change in the status of his license? Yes, Your Honor, he did sign the forms that are authorized by the, that are required for employment. However, there's evidence in the record that driving is not required for performance of the substation maintenance, electricity duties, and that others continue to be allowed to perform those duties even without a license. But it's clear that November 11, 2009, he signed a document and it says, I will promptly report any change in my driver's license status to my supervisor. And he didn't comply with that duty in 2010. No, Your Honor. Did you, Your Honor, save the balance of your time? Yes, Your Honor, did you? Good morning. Good morning. Please support. Good morning. You see, you have had a very significant importance. You're Mr. Lafayette. Yes, Your Honor, Harry Lafayette, Your Honor. You see, you have had a very important and significant job. What he was in charge with was taking care of the electrical power system that provided energy to people in their homes, their offices, and their businesses. And over the course of his employment, he repeatedly violated some fundamental rules, which had to do with how you perform switching your switch. And these are rules that you don't have to rely upon your memory. These are rules where there are checklists provided for you, where you go through each checklist, check by check by check, making sure that you've done everything. At the time that he committed the act, which ultimately led to his termination in May, he was already on active discipline, but not having followed those same procedures in December of 2010. He was on active discipline at that time. He had already violated rules that required him to advise the company if he had any change with regard to his driving privileges, and he had failed to do that to him. And then when his supervisor had questioned him about his driving privileges, he gave answers which bordered upon listening to the out-and-out, just wrong. Well, he's served from opposing counsel to the dean. There's no real indication that he knew how to respond to them regarding his driver's license. There is evidence that he knew. He knew when his license was taken from him in 2010. He knew when he was arrested on April 24, 2011, and his license was taken, and he knew at that point in time when he had to go to the DMV and they wouldn't give him a driver's license. He instead picked up a California ID card. He knew. And when you reach beyond all of that, there's no final issue of fact here. This is a person who repeatedly was told, advised, and saw that his driver's license was invalid, and he had not advised anyone at PG&E of that information. You acknowledge that the district court applied perhaps the wrong standard in determining whether he had established a privatization case. What I would say to that, Your Honor, is that when I read the opinion, I see the language that the district court uses, but I also acknowledge at the same time that regardless of the language that the district court used, there is simply no evidence in this record that this individual is an absentee or fully at the satisfactory level. Well, the standard is minimal. It does not need to rise to the level of preponderance. And so based on what Mr. Patton is saying, the DMV passed these tests. He was at the minimum level and able to qualify. As this court recognized and questions were raised, this is not a case where he's actually being interviewed for a job. This is a case where we have an individual who is actually performing the job, who is performing a significant job, and who is supposed to be taking care of a lot of safety issues. Passing a test under those circumstances just does not demonstrate that you are satisfactorily performing the job. But it's an off-setting test. It's a test related to switching. The test that he ended up getting 93, 90, maybe 100 percent, it was a test directed at the task of switching. He was a test directed at performing a switching function, and yet with that still doesn't mean that you're satisfactory of performing the job. Remember, he's already on that discipline for having performed, for having done a switching error already, and he did that in December. So now where are we? Five months later, he's already doing it again. And what's the consequence of this? The total amount of people affected by this switching error is over 20,000. Over 20,000 customers lost their power. This one last switch cost 6,100 customers to lose their power. This is not someone who's making a stamping, working on a stamping machine or something. This is someone who has the responsibility for making sure that people continue to have electrical energy that is uninterrupted. And that's what he's doing. Passing a test under the circumstances isn't enough. Getting a positive review isn't enough. We know that from the cases. In this case, what we're really looking at is whether or not this is an individual who actually is doing the job he's supposed to do. How can we say that when he's not even telling us that he's lost his license and he's driving company vehicles on the streets in those circumstances? We have to look at the out of the line most favorable to the plaintiff at this stage. And so one of the arguments that Mr. Patton is making on behalf of Mr. Abram is that there are different categories of discipline, and we can't put them all together. I'm curious, can we look at his entire employment history, or are we limited as Mr. Patton argues? I would say in the first instance that appears to be an argument that's created today that didn't exist for the district court. Remember, there was no argument made at the district court level that he would address the issue of satisfactory performance of the job. Plaintiff did not address that. The district court itself had to scour the records to see if there was anything that might even be present there. This is what we have here as an instance, where plaintiff completely overlooked the issue, ignored the issue of primary patient problems as it relates to satisfactory performance of the job. And then we get to this, I don't care how they slice it, he was objecting to discipline that was still open, that was still unresolved, that still required him to do certain things at the time these incidents occurred. You may ask about the switching errors, because I believe the arguments have been made in the briefing that they are common and that there are other employees in the record who committed these switching errors or only received written reminders and they weren't terminated for these switching errors. What's your response to that? The court's opinion speaks specifically to individuals who have repeated instances of such problems, and that's what we have here. This individual was responsible for almost half of all switching errors in his station, almost half. That's the fate of them. No one else goes to the level of being at the point that we watch the switching errors. So that's the first thing that we have to look to, a repeat offender here with regard to this specific statute. Later that was something else. So we start, I think we're talking about the comparators. There are no comparators with regard to the driving issue. Remember, there are two reasons that he is terminated. One relates to the switching error. The other relates to the driving. The record before you shows that we scoured, we looked for someone else who had ignored the responsibility of reporting that they had lost their license. We found one, and that person was not of the same race as granted, and that person was fired. He can't point to someone who was treated better than him with regard to this driving issue, who was of a different race than he was. It doesn't exist. He was treated the same as everyone else. Then we get to the switching error. We don't see anyone else who has the same magnitude of problems. We see people who are of different races, who receive different levels of discipline, depending upon what the circumstances show. Nothing like his. There are no comparators here that even come close to the level of problems that he presented in the workplace. So we've got two issues here. One, satisfactory performance of the job, of which prices play no argument in the district court. And two, the issue with regard to whether or not they're anywhat comparable or if someone was treated better. And again, there's no evidence here. Try as they might to try and slice the evidence up at the end of the day. What you look at is this. Was there someone else who didn't report? Was there someone else who didn't report who didn't get fired? No. Was there anyone else in the extended district that had the extended level of problems that he had with switches? No. Where's the evidence then? This is not an issue of slicing evidence or shading evidence or anything. It's not there. So at the end of the day, he doesn't meet two of the problems of the crime-of-patient case. I know often lawyers ignore the crime-of-patient case. They want to go directly to is there a legitimate business reason? Is there a pretext? Because there's a reason why the crime-of-patient case exists. There's a reason why it's there. And it's there so that we don't have to slip to the second and third cause automatically. We need to make sure that people are held to the test. Let me ask you, if we were to find that there's enough evidence for the plaintiff to make a pre-trial case and there's enough evidence on the part of PG&E to provide, and then we start looking at the issue of pretext, one of the arguments that the plaintiff has made is that when it came to commendations, when it came to attaboys, when it came to African-Americans, it was basically radio silence, that there was really no recognition of African-Americans taking any responsibility. You know what the answer to that is? All things that we hear have to be taken into context. Where is the evidence that someone who is African-American did an attaboy type, did an attaboy thing? We pointed out specifically in this brief that those individuals who did these attaboys did something that was worthy of recognition, not coming to work, not just doing your job. They did something extra. So what happens here, the plaintiff had demonstrated that if there was a person who did something and didn't receive recognition for it, they'd be having a different conversation. But we don't have that. So what we have is really a strong argument here. Someone didn't get it. Well, the predicate to that is, did someone deserve it? And that's what's missing here. And it's not like there are a lot of these attaboy things given. They're not. They are rare given. Even in the record that you have before you, they are rarely given. But when they are given is in recognition about something different. We don't have any testimony here that someone was deserving and didn't get it. It's nothing. That's what it comes down to. We get to the issue of whether or not we could, but I think if you look at the way the district court fashioned the argument with regard to the issue of the comparators and whether or not there's evidence that someone was treated better than he was, if you look at the language that the district court uses, he says, normally this is something, normally this is something that we would address at the pretext stage. But then he goes on to say, but I don't need to get to the pretext stage, but what you wind up seeing is that the argument he is using with regard to why the prime officer just isn't met is synonymous with what would happen at the pretext stage as well. There isn't any evidence here to meet the pretext stage, and that's because he doesn't exist at the prime officer stage. With the pretext stage, he's articulated reasons which are supportive of discrimination, and if you, it sounds like you acknowledge that there were no African-Americans or other people of color who got commendations or recognition to do that. In the record that you have. You explain, but you're acknowledging that at the same time, and so how does that create a genuine issue of fact? I don't think so. I think if plaintiff had demonstrated that there were African-Americans who had actually done something noteworthy, who had done something which justified that, but how can you say that just because someone didn't get something that they should have gotten it when there's no evidence that they should have? Well, let me ask you. Recognizing it would be difficult for the plaintiff to basically interview every African-American, every employee of color, to ask them, have you ever done something that you believe you should have gotten at a boy and you didn't, it's a bit difficult. So to accept that is a challenge. And then you have the numbers, and you end up having 20, 30, 40 at-a-boys, all of whom are awarded to Caucasians. Does that create an inference of sorts? I don't think so. Without your respect, what we have here is this is not a big workplace. These guys all work together in the same location, I'll try to count those, which is right to the airport from here. This is not where he has to travel around the state of California, by the NJRPG, to ask you if anyone got an at-a-boy. But this is basically individuals who reported to one person, Boris Kankin, and that's not a large group of people. And he's already identified the total number of African-Americans who reported to Boris Kankin, and it's about four. So really, it's not that difficult to find out if anyone did an at-a-boy. More importantly, these guys all get together, and this is in the record, at what's called the tail port where they discuss what they're about to do. All right, thank you very much. We're out of time. Thank you. Thank you, sir. Could you address this issue of comparators and show us where in the record there's evidence to support your position? Certainly. Thank you, Judge Uriel. With respect to solely situated individuals, the prevailing excerpt of all of this is not that the person has to have done exactly the same thing, but it has to be of the same graph. And that was actually part of the discovery. And what we allege was discovery of structures in our opening brief was this question of what a solely situated comparator is. Employee number 20, a Caucasian, was put on the DML, is the decision-making leave, which is the final step before potential termination. That's the level of discipline. This should come with falsification of time records, misuse. There was no termination of that, because that's excerpts 71 and 85. And indeed, they have to agree with that stage. Determining what level of discipline is appropriate is essential to determining whether the employee meets the employer's minimum qualifications or is performing satisfactorily under the rubric of the positive discipline policy. Because if the appropriate level of discipline is a DML instead of a termination, it should be a DML. With respect to the trade tax analysis, there's a number of different stark issues. Simply that the attiboes were reserved for Caucasians and that those attiboes actually worked to the benefit of those that were, yeah, discipline proposed for them to reduce the proposed discipline. But there's only been two people ever terminated at PG&E for switching years. Both of them were terminated by Boris Naikin and Ed Bonham. Both of them were supervised in the history of the company. As far as the evidence shows, only four people have been put on crisis suspension. This is outside of the positive discipline policy. Plaintiff and his two African-American counterparts comprise three of those. Those are striking numbers. These are outside of the norm. These are far outside what should be expected from the workplace. It is not infected by racial bias. A reasonable jury could use these facts to infer that Boris Naikin, with all of the racial hostility investigations by corporate security, the graffiti on the whiteboards, the other complaints of discrimination and abuse, Naikin and Bonham, that these circumstances are the circumstances in which a reasonable jury could infer that race played a part in that decision-making. And again, just to conclude, with respect to the performing your job competently at the Freedom of Passion stage, analysis must occur before the events for which you're terminated. Otherwise, no plaintiff could ever break the race case based on discrimination and discipline. Thank you, Your Honors. Thank you. Thank you very much. I appreciate that. Very good presentations here today. So, Mr. Bennett and Mr. Lafayette, thank you very much. The case of Ingram v. Pacific Gas and Electric Company is now submitted and will be in recess for the rest of the day. Thank you very much.
judges: Fernandez, Murguia, Curiel